# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-0093V**
UNPUBLISHED

---

JODY BIDLACK,

                Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                Respondent.

---

Chief Special Master Corcoran

Filed: March 6, 2023

Special Processing Unit (SPU);
Entitlement to Compensation; Table
Injury; Decision Awarding Damages;
Pain and Suffering; Influenza
Vaccine; Shoulder Injury Related to
Vaccine Administration (SIRVA)

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for Petitioner.*

*Zoe Wade, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On January 28, 2020, Jody Bidlack filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a Shoulder Injury Related to Vaccine Administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to her on December 30, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons described below, I find that Petitioner is entitled compensation, and I award damages in the amount **$101,811.07**, **representing $100,000.00 in actual pain and suffering, $1,220.63 in unreimbursed expenses, and $590.44 in lost wages.**

---

[1] Although I have not formally designated this Decision for publication, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002, because it contains a reasoned explanation for my determination. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.   Relevant Procedural History

As noted above, the case was initiated in January 2020. ECF No. 1. After Respondent completed his review of the records, the parties began settlement discussions in June 2021. ECF No. 27. But Petitioner filed a status report on November 12, 2021, informing me that the parties had reached an impasse in their negotiations. ECF No. 37.

Petitioner subsequently filed a Motion for Ruling on the Record and Memorandum in Support of Damages ("Mot.") on January 14, 2022. ECF No. 40. Petitioner argues that she has established entitlement to compensation for an on-Table SIRVA claim, or in the alternative, a causation-in-fact claim, and requests an award of $105,000.00 in past/actual pain and suffering; $1,220.63 in past unreimbursed expenses; and $3,782.40 in lost wages. *Id*. Respondent filed his Rule 4(c) Report and Response to Petitioner's Motion to Ruling on the Record ("Resp.") on March 14, 2022. ECF No. 41. Respondent maintains that Petitioner has failed to establish entitlement to compensation, because Petitioner "has not established the absence of any other condition or abnormality that would explain Petitioner's symptoms." Resp. at 8. In the event I find Petitioner entitled compensation, however, Respondent recommends that I award a lower pain and suffering sum. *Id*. at 13. Respondent defers to my review of Petitioner's requests regarding lost wages and unreimbursed expenses. *Id*.

## II.   Fact History

Petitioner was 55 years old when she received an influenza vaccination in her right deltoid on December 30, 2017. Ex. 1 at 2. Petitioner recalled experiencing pain and stiffness in her shoulder the next day. Ex. 15 at ¶2. She alleges that she thereafter called her doctor in January 2018[3] about her shoulder pain, but was told to "give it more time and call if [her] symptoms got worse." *Id*. at ¶3. Also in January 2018, "several weeks after her vaccination," Petitioner fell on ice, landing on her right hip. Ex. 16 at ¶7; Ex. 15 at ¶4. Both Petitioner and her husband stated that her shoulder was not impacted in the fall. *Id.* Petitioner's husband "specifically recalled" that Petitioner had woken him up and had not done chores on their farm due to her shoulder pain before her fall. Ex. 16 at ¶7.

On February 7, 2018, Petitioner presented to her primary care practice, seeing Dr. Mark L. Mahloch about her complaints of "1.5 months of right shoulder pain." Ex. 2 at 61. Dr. Mahloch noted that Petitioner had "pain right after her flu shot" and then "3 weeks later she did take a fall, mainly landing on her right hip but shoulder has been

---

[3] Petitioner filed Verizon phone records showing a call she made on January 8, 2018 (nine days after her vaccination) to the phone number (402) 359-2277, which is registered to Methodist Physicians Clinic in Valley, NE. *See* Ex. 17 at 2.

progressively worsening since then." *Id.* On exam, Dr. Mahloch noted that Petitioner's AC joint was "exquisitely tender," her internal rotation was reduced, and her supraspinatus was "noticeably weak." *Id.* Dr. Mahloch reviewed an xray report regarding Petitioner's right shoulder, noting "AC joint may have a few mm of separation making it a first-degree separation with some hazy inflammation findings just above it." *Id.* He diagnosed a "rotator cuff injury and likely a first-degree AC separation," prescribed a Medrol dosepak, and referred Petitioner to physical therapy. *Id.* Petitioner did not begin physical therapy at this time.

On May 29, 2018 (almost four months later), Petitioner returned to her primary care practice to follow up on her right shoulder pain. Ex. 2 at 41. She told Dr. Patrick J. McCarville that her shoulder pain began within 24 hours of immunization and had not improved since. *Id.* On exam, Dr. McCarville found range of motion "very much different than the left shoulder," which had normal range of motion. *Id*. Dr. McCarville reviewed the prior x-ray and diagnosed Petitioner with immunization induced adhesive capsulitis. *Id.* He prescribed Celebrex and referred Petitioner to physical therapy. *Id.*

On June 6, 2018, Petitioner presented to physical therapy stating that she began having shoulder pain the day after a flu shot on December 30, 2017. Ex. 6 at 40. Petitioner described her pain as constant, decreasing to 2/10 with rest and increasing to 8/10 with movement. *Id.* She stated that she was mostly able to do her desk job with some increase in shoulder pain, but she was limited in other activities, including horseback riding, working on the farm, and sewing. *Id.* Although Petitioner had 5 total sessions of physical therapy through June 18, 2018, "her shoulder motion did not increase much and pain persisted." *Id*. at 48.

On June 20, 2018, Petitioner returned to Dr. McCarville for a follow up on her right shoulder pain. Ex. 2 at 15. Dr. McCarville assessed "adhesive capsulitis post immunization" and referred Petitioner to an orthopedist after physical therapy and anti-inflammatories did not provide relief. *Id.*

On June 25, 2018, Petitioner presented to orthopedist, Hsueh-Yu Wesley Cheng, M.D. Ex. 5 at 23. She reported that her pain began in late December after she received a flu shot. *Id.* She reported no relief from her previous treatments, including medications and physical therapy. *Id.* She noted that the pain woke her up every hour while sleeping. *Id.* On exam, Petitioner had limited active and passive range of motion, with pain at the end points. *Id*. at 24. Dr. Cheng reviewed the previous x-ray and had new x-rays taken that day. *Id.* He noted that the x-ray from February 2018 were limited and did not show the glenohumeral joint. *Id.* He did not note a shoulder separation on either x-ray. *Id*. Dr. Cheng assessed adhesive capsulitis and discussed nonoperative and operative

treatment options with Petitioner. *Id*. Petitioner elected to proceed with a manipulation under anesthesia. *Id.*

On July 11, 2018, Dr. Cheng performed a right shoulder manipulation under anesthesia. Ex. 7 at 28. He was able to obtain full range of motion without any procedures. *Id.* The day after, Petitioner returned to physical therapy. Ex. 6 at 20. Petitioner rated her pain at 4/10 at rest and 7/10 with activity. *Id.* She completed 15 post-surgery physical therapy treatments. *Id.* at 33. Because Petitioner's insurance benefits were exhausted, she was discharged from physical therapy prior to accomplishing all of her goals. *Id.* At her last session, on August 27, 2018, Petitioner reported feeling less pain and improved symptoms in her shoulder, but some continued soreness. *Id*. at 32.

On July 19, 2018 and August 21, 2018, Petitioner had follow-up appointments with Dr. Cheng. Ex. 5 at 2; Ex. 9 at 2. At her August visit, Petitioner reported improvements in range of motion and daytime pain, but continued pain at night that woke her on a daily basis. Ex. 9 at 2. Petitioner explained that she was running out of coverage for physical therapy. *Id.* Dr. Cheng administered a cortisone injection and encouraged Petitioner to continue her home exercise program on her own. *Id.*

On January 21, 2019, Petitioner returned to Dr. Cheng reporting continued pain at the end ranges of motion and continued symptoms at night that wake her up. Ex. 9 at 7. She reported initial relief after the cortisone injection. *Id*. A second cortisone injection was administered. *Id.* There are no additional treatment records.

Petitioner described the impact of her injury on her daily life in her affidavit. *See* Ex. 15. She noted that over two years after her vaccination, she continued to have pain and reduced strength in her right arm. *Id.* at ¶8. She stated that she is no longer able to work on her farm without assistance. *Id.* She continued to have difficulty sleeping "since there is no comfortable way to lay." *Id.* at ¶9.

## III.    Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a Tdap vaccine. 42 C.F.R. § 100.3(a)(II)(C). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological

---

[4] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

5

abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B. Factual Findings Regarding QAI Criteria for Table SIRVA

After a review of the entire record, including the parties' briefs, I find that Petitioner has preponderantly satisfied the QAI requirements for a Table SIRVA. The medical records and affidavits filed in this case are hereby incorporated by reference.

### 1. Prior Condition

The first QAI for a Table SIRVA requires that a petitioner have no history of problems associated with the affected shoulder which were experienced prior to vaccination and would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i).

Respondent does not dispute that Petitioner has met the first requirement under the QAI for a Table SIRVA. Additionally, I do not find any evidence that Petitioner suffered a pre-vaccination history of problems that would explain her post-vaccination shoulder symptoms. Accordingly, I find that Petitioner has met this first criterion to establish a Table SIRVA.

### 2. Onset of Pain

A petitioner alleging a SIRVA claim must also show that she experienced the onset of pain within 48 hours of vaccination. 42 C.F.R. § 100.3(c)(10)(ii).

Respondent does not dispute Petitioner has met this requirement. Additionally, I find that Petitioner's medical records establish that she suffered the first symptoms or onset of shoulder pain within 48 hours of her flu vaccination on December 30, 2017. *See, e.g.*, Ex. 2 at 40, 60; Ex 5 at 22; Ex. 6 at 38; Ex. 15 at ¶2. Accordingly, I find that Petitioner has met this criterion to establish a Table SIRVA.

### 3. Scope of Pain and Limited ROM

Respondent has not contested that Petitioner meets this criterion. In addition, the medical records document pain and limited range of motion only in Petitioner's right shoulder following her flu vaccination. *See, e.g.*, Ex. 2 at 40, 60; Ex 5 at 22; Ex. 6 at 38. I thus find that Petitioner has demonstrated by a preponderance of the evidence that her pain and reduced range of motion were limited to the shoulder in which the intramuscular flu vaccine was administered.

### 4. Other Condition or Abnormality

The last QAI criteria for a Table SIRVA states that "[n]o other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)." 42 C.F.R. § 100.3(c)(10)(iv).

Respondent argues that "the evidence establishes the presence of a likely right shoulder sprain that would explain Petitioner's symptoms." Resp. at 8. Respondent highlights the record of Petitioner's first post-vaccination treatment for her shoulder pain, when Dr. Mahloch reviewed x-rays and noted "AC joint may have a few mm of separation making it a first-degree separation with some hazy inflammation findings just above it." Ex. 2 at 61. Dr. Mahloch went on to diagnose Petitioner with "rotator cuff injury and likely a first-degree AC separation." *Id.* Respondent argues that this diagnosis is a shoulder sprain associated with the fall reported by Petitioner three weeks after her vaccination, and that it explains the symptoms Petitioner experienced throughout her treatment. Resp. at 8-10.

Respondent further argues that Petitioner ignores Dr. Mahloch's statements regarding a shoulder separation in arguing that her flu vaccination caused a SIRVA injury. Resp. at 9. However, Respondent's argument relies on only one record and ignores the

records of ongoing treatment that both do not mention a shoulder separation or sprain, while consistently linking Petitioner's symptoms to her vaccination. First, Petitioner has provided preponderant evidence that she made a call to her PCP on January 8, 2018, ten days after her vaccination (and before the fall on ice), reporting her shoulder pain from the vaccination. *See* Ex. 15 at ¶3; Ex, 17 at 2. Second, the remainder of Petitioner's medical records consistently connect her flu vaccination to her shoulder symptoms and not the accident. *See e.g.*, Ex. 2 at 15 (adhesive capsulitis post immunization); Ex. 2 at 41 (diagnosed with immunization induced adhesive capsulitis); Ex. 5 at 23 (Petitioner reported aching and throbbing and decreased range of motion since her flu shot). Notably, no other treating physician assessed or mentioned a shoulder separation or shoulder sprain.

Respondent argues that the lack of mention of Petitioner's shoulder sprain in later records is due to Petitioner's failure *herself* to mention the fall on the ice or the shoulder separation. Resp. at 9. However, it is well established that "medical records may be incomplete or inaccurate," because a petitioner failed to report everything that happened at the relevant time, or where the medical professional failed to document everything a petitioner said accurately in the written record. *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998); *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

While Respondent is correct that Petitioner's later records do not memorialize comments by Petitioner about her post-vaccination fall, or Dr. Mahloch's impression of her x-rays, it is speculation to conclude that Petitioner "hid" this relevant piece of information – or, more so, that her treaters were denied access to records disclosing it, like Petitioner's x-rays. In fact, the second provider Petitioner saw, Dr. McCarville, was in the same practice as Dr. Mahloch. *See* Ex. 2 at 41, 61. Further, there is evidence that Petitioner's orthopedist, Dr. Cheng, reviewed the x-ray on which Dr. Mahloch based his assessment of a *likely* AC separation. Ex. 5 at 23. Dr. Cheng's record specifically notes that he reviewed the February 2018 x-ray and compared them to those taken at the June 25, 2018 appointment. *Id.* His reading of the x-rays did not include a shoulder separation on either. *Id*.

In addition, Petitioner's and her husband's testimony is consistent with the medical records. Both affidavits described Petitioner's fall on the ice as minor, primarily involving her right hip as opposed to her right shoulder. Ex. 15 at ¶4; Ex. 16 at ¶¶7. Both also recalled the shoulder pain and limitations Petitioner was experiencing *prior* to the fall. Ex. 15 at ¶2-3 (Petitioner recalled her pain starting the day after vaccination and worsening enough that she called her doctor for advice.); Ex. 16 at ¶7 (Petitioner's husband "specifically recalled" that Petitioner had woken him up and had not done chores on their farm due to her shoulder pain before her fall.). In the record of the February 7, 2018 visit,

Dr. Mahloch noted that Petitioner had "pain right after her flu shot" and then "3 weeks later she did take a fall, mainly landing on her right hip but shoulder has been progressively worsening since then." Ex. 2 at 61. This testimony does not contradict the medical records in which Petitioner consistently reported that her pain began with her flu shot and that her fall impacted her right hip rather than shoulder. Although later oral testimony that conflicts with medical records is less reliable, it is appropriate for a special master to credit a petitioner's lay testimony where is does not conflict with contemporaneous records. *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1382-84 (Fed. Cir. 2021).

In the end, there is only one document evidencing a shoulder sprain, while the preponderance of evidence shows that Petitioner suffered a pre-accident shoulder injury from her flu vaccine that was not exacerbated or impacted by the fall on ice. Accordingly, I find that Petitioner has established that there is no other condition or abnormality in the medical records that would explain Petitioner's post-vaccination symptoms.[5]

### C. Other Requirements for Entitlement

As stated in the previous section, I find that the onset of Petitioner's left shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this QAI requirement). This finding also satisfies the requirement that the first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(II)(C) (listing a time frame of 48 hours for a Table SIRVA following receipt of the Tdap vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA and is entitled to a presumption of causation.

Even if a petitioner has satisfied the requirements of a Table injury or established causation-in-fact, however, he or she must also provide preponderant evidence of the additional requirements of Section 11(c), i.e. receipt of a covered vaccine, residual effects of injury lasting six months, etc. *See generally* § 11(c)(1)(A)(B)(D)(E). But those elements are established or undisputed. Petitioner is entitled to compensation in this case.

## IV.    Damages

### A. Legal Standards for Damages Awards

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully

---

[5] Certainly it is conceivable that a Program claimant could suffer an intervening accident post-vaccination that *did* better explain subsequent symptoms than the alleged SIRVA – or that played a role in exacerbating symptoms that would bear on the quantum of damages to be awarded. But *in this case* they evidence does not preponderate in favor of either possibility.

adopt and hereby incorporate my prior discussion in Sections II and III of *Berge v. Sec'y Health & Human Servs.*, No. 19-1474V, 2021 WL 4144999, at *1-3. (Fed. Cl. Spec. Mstr. Aug. 17, 2021).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. [6]

## B.  Appropriate Compensation for Pain and Suffering

In this case, Ms. Bidlack's awareness of her injury is not disputed, leaving only the severity and duration of that injury to be considered. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the same record relied upon to determine entitlement. I have also considered prior awards for pain and suffering, in both SPU and non-SPU SIRVA cases, and drawn upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

The record establishes that Petitioner's shoulder pain was moderate in the beginning. Although Petitioner called her PCP approximately ten days after vaccination to report her pain, she did not make an appointment until about 40 days after vaccination. Ex. 2 at 61. At that appointment, she was prescribed physical therapy treatment, which she elected not to do at that time. *Id.* Then, she did not return for further treatment for almost four months. Ex. 2 at 41. These facts suggest that Petitioner's symptoms, including pain, was tolerable during the first five months after her vaccination.

Once Petitioner returned to her PCP on May 29, 2018, she aggressively treated her shoulder pain. She began physical therapy on June 6, 2018, where she rated her pain at 8/10 at worst, decreasing to 2/10 with rest. Ex. 6 at 40. After five sessions of physical therapy did not provide relief, Petitioner presented to an orthopedist, Dr. Cheng, who recommended a less-intrusive surgical procedure (manipulation under anesthesia) which she had on July 11, 2018. Ex. 5 at 23-24; Ex. 7 at 28. She returned to physical therapy

---

[6] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

the following day, reporting pain between 4/10 and 7/10. Ex. 6 at 20. Petitioner continued physical therapy for 15 sessions but was discharged prior to accomplishing her goals due to limitations with her insurance. Ex. 6 at 33. She continued to have significant post-surgery pain that required two cortisone injections. Ex. 9 at 2, 7. The second injection, on January 21, 2019, approximately 13 months after her vaccination, seems to have substantially relieved Petitioner's pain as she did not seek further treatment. Ex. 9 at 7.

Also bearing upon the pain and suffering sum to be awarded are Petitioner's sworn affidavit and that of her husband. Throughout her records and her affidavit, Petitioner describes difficulty sleeping due to pain. Ex. 5 at 23 ("Most bothersome to her is the pain that she is having at night. She is waking up every hour because of discomfort in her shoulder."); Ex. 15 at ¶7, ¶9 ("no comfortable way to lay"); Ex. 16 at ¶7 (kept waking her husband). Additionally, Petitioner's injury has impacted her ability to help with activities on her family farm and her ability to enjoy her hobbies, including stacking hay in the barn, carrying feed for animals, gardening, horseback riding, and quilting. Ex. 6 at 40; Ex. 15 at ¶8; Ex. 16 at ¶5-6. Both Petitioner and her husband mentioned that Petitioner was less able to enjoy her grandchildren due to her injury. Ex. 15 at ¶9; Ex. 16 at ¶4.

Petitioner cites ten prior vaccine cases in her brief with awards ranging from $70,000 and $125,000 to support her request for $105,000 in pain and suffering.[7] Mot. at 31-32. Petitioner's comparable cases provide a reasonable range for her pain and suffering award. Of the ten cases, this case seems the most similar to *Martin v. Secretary of Health and Human Services,* 2021 WL 2350004. No. 19-0830 (Fed. Cl. Spec. Mstr. May 5, 2021). The *Martin* petitioner sought treatment 11 days after his vaccination with mild pain. *Id*. at *3. After his first appointment, he did not seek any treatment, other than a home exercise program, for 18 weeks. *Id.* Then, upon returning to treatment, Mr. Martin had a cortisone injection, an MRI, and an arthroscopic subacromial decompression. *Id.* After surgery, the *Martin* petitioner had three months of physical therapy (16 sessions) and regained most of his shoulder function. *Id*. at *4. His total treatment was about 12 months, although he expressed some lingering symptoms, including pain and difficulties with activities. *Id*. He was awarded $100,000 in pain and suffering. *Id*. at *5.

Here, Ms. Bidlack called her doctor within ten days, but waited a little over a month to seek treatment. She also had a break in treatment after her first visit of about four months (similar to the gap in Mr. Martin's treatment), electing not to do physical therapy at that time. Upon her return to treatment, she had five sessions of physical therapy, and then a manipulation under anesthesia. Her post surgery treatment was more significant,

---

[7] Respondent, by contrast, did not provide a proposed award, but states only that "Respondent requests that this Court issue an order denying Petitioner's request for $105,000.00, and instead, award pain and suffering damages in a lower amount that is consistent with the evidence presented." Resp. at 13.

with 15 physical therapy sessions and two cortisone injections over six months. She stopped treatment after 13 months. Although Ms. Bidlack had a less significant surgical procedure (with no arthroscopic or open procedures) than did Mr. Martin, her post-surgical treatment was more significant, primarily in severity of pain, which required two cortisone injections. Both petitioners reported ongoing symptoms, including pain and difficulty with activities. Overall, Ms. Bidlack's pain and suffering was similar to that experienced by Mr. Martin.

Accordingly, balancing the severity of Petitioner's SIRVA injury and the impact on her personally, and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$100,000.00** in total compensation for actual/past pain and suffering is reasonable and appropriate in this case.

### C.  Out of Pocket Expenses

Petitioner requests $1,220.63 in past unreimbursed expenses. Mot. at 29. Respondent does not dispute this sum and relies on my review of Petitioner's submitted documents. Resp. at 13. I have reviewed the documents submitted by Petitioner at Tab A of her brief (Mot. at 36-44) and conclude that Petitioner's request is appropriate. Therefore, she is awarded **$1,220.63** without adjustment.

### D.  Lost Wages

In her brief, Petitioner argues that she suffered lost wages because she "was forced to use paid time off ("PTO") for treatment related to her SIRVA injury, including recovery from her surgery. Mot. at 29. She bases her argument on the Court of Federal Claims' recent decision in *Gross v. Secretary of Health and Human Services*, 154 Fed. Cl. 109 (2021), in which the Court declined to review both my decision to award lost wages for a petitioner who has used PTO and the amount I awarded. In support of her claim, Petitioner provided a document from her employer regarding "Personal Time Off" and her pay statements showing the time off she used for her SIRVA treatment. *See* Mot. at 45-55. With respect to Petitioner's request, Respondent stated only that her provided documents "speak for themselves" and deferred to my judgment regarding any amounts awarded. Resp. at 13.

The policy of Petitioner's employer states that PTO will accrue up to a maximum of 200 hours and will no longer accrue after that point until the balance falls below 200 hours. Mot. at 46. Petitioner argues that she used a total of 60 hours of PTO between December 24, 2017 and July 21, 2018. *Id*. at 48-55. However, the total number of hours reflected on the pay statements equals 56: 8 hours between December 24, 2017 and

January 6, 2018; 4 hours between February 18, 2018 and March 3, 2018; 8 hours between April 1, 2018 and April 14, 2018; 8 hours between May 27, 2018 and June 9, 2018; 4 hours between June 24, 2018 and July 7, 2018; and 24 hours between July 8, 2018 and July 21, 2018. *Id.* Petitioner's medical records do not reflect any treatment for her SIRVA injury between February 8, 2018 and May 29, 2018. As a result, the 12 hours during that period will be excluded, resulting in a claim for 44 hours of PTO as lost wages.

In *Gross*, a primary consideration was the fact that the PTO in question was not subject to a cap or a "use or lose" policy. *Gross v. Sec'y of Health & Human Servs.*, 2021 WL 2666685, No. 19-0835V, at *6 (Fed. Cl. Spec. Mstr. March 11, 2021). This suggests a higher probability than otherwise that the *Gross* petitioner would receive a reimbursement for accrued PTO at the time she left her employment because she could carryover PTO from year to year. *Id.* Ms. Bidlack's probability is much lower, however, because her paid time off is capped at 200 hours (or roughly 25 workdays), and her pay statements reflect that she carried a balance of more than 100 hours of PTO during the period in question. Mot. at 48-55. Considering all of the above, and the fact that Petitioner has offered *some* evidence that she would receive compensation, I find it reasonable to award Petitioner one-quarter of the PTO she used during treatment of her SIRVA, which I determine to have a value of **$590.44**.[8]

## Conclusion

For all of the above reasons, the I award Petitioner a lump sum payment of **$101,811.07,** (representing $100,000.00 for Petitioner's actual pain and suffering, $1,220.62 for unreimbursable out-of-pocket expenses, and $590.44 in lost wages) in the form of a check payable to Petitioner Jody Bidlack.

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[9]

---

[8] For the period December 24, 2017, Petitioner earned $2,113.86 per pay period. Mot. at 49. This amounts to $52.85 per hour based on a 40 hour work week ($2,113.86/40 = $52.85). Therefore, 8 hours of PTO used during that pay period has a value of $422.80. For the remainder of the period, Petitioner earned $2,154.54 per pay period, or $53.86 per hour. Mot. at 50-55. Therefore, the value of the remaining 36 hours of PTO used is $1,938.96 ($53.86 * 36 hours = $1,938.96). The total value of the PTO is $2,361.76 ($422.80 + $1,938.96 = $2,361.76), one-quarter of which is $590.44 ($2,361.76/4 = $590.44).

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master